No. 23-1196

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA, *ex rel.*
and STATE OF MICHIGAN, *et al., ex rel.*,

*Plaintiffs*,

MICHAEL ANGELO and MSP WB, LLC,

*Relators-Appellants*,

v.

ALLSTATE INSURANCE COMPANY, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Michigan, No. 2:19-cv-11615,
Hon. Stephen J. Murphy, III, U.S. District Judge

## BRIEF OF THE AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION, THE MARC COALITION, AND THE DRI CENTER FOR LAW AND PUBLIC POLICY AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Timothy H. Lee
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
(404) 572-4600
tlee@kslaw.com

David J. Farber
*Counsel of Record*
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
dfarber@kslaw.com

*Counsel for Amici Curiae*

August 23, 2023

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, the American Property Casualty Insurance Association, the MARC Coalition, and the DRI Center for Law and Public Policy each certify that they are non-profit membership organizations with no parent companies and no publicly traded stock.

/s/ David J. Farber
David J. Farber

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT...........................................i

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION ..............................................................3

STATUTORY BACKGROUND...............................................3

    A.    The Medicare Program .........................................3

    B.    The Medicare Secondary Payer Act .......................4

ARGUMENT .................................................................11

I.    Section 111 Reporting Cannot Give Rise to Liability Under the False Claims Act .......................................11

II.    The Allegations Regarding Exemplars E.A. and K.S. Fail to State a Claim...............................................15

CONCLUSION .................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Bio-Med. Applications of Tenn., Inc.*
*v. Cent. States Se. & Sw. Areas Health & Welfare Fund*,
656 F.3d 277 (6th Cir. 2011) ............................................................. 4, 5

*MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*,
No. 20-CV-2102,
2021 WL 1164091 (S.D.N.Y. Mar. 26, 2021) ...................................... 11

*MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*,
66 F.4th 77 (2d Cir. 2023) .................................................................. 11

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 Fed. App'x 619 (6th Cir. 2016) ..................................................... 17

*U.S. ex rel. Hobbs v. MedQuest Assocs.*,
711 F.3d 707 (6th Cir. 2013) ............................................................... 13

*U.S. ex rel. Takemoto v. Nationwide Mut. Ins. Co.*,
674 F. App'x 92 (2d Cir. 2017) ........................................................... 14

**Statutes & Regulations**

42 U.S.C. § 1395x ................................................................................ 15

42 U.S.C. § 1395y .......................................................................... *passim*

Medicare, Medicaid, and SCHIP
Extension Act of 2007 (MMSEA),
 Pub. L. No. 110-173, 121 Stat. 2492 .................................................. 8

42 C.F.R. § 411.21 ................................................................................. 5

42 C.F.R. § 411.51 ............................................................................... 10

**Other Authorities**

Form 1500,
  https://www.cms.gov/medicare/cms-forms/
  cms-forms/downloads/cms1500.pdf ........................................ 8

HHS OIG,
  No. OEI-02-22-00390,
  Opioid Overdoses and the Limited Treatment of Opioid
  Use Disorder Continue to Be Concerns for Medicare
  Beneficiaries (Sept. 2022) .................................................... 16

*Mandatory Insurer Reporting (NGHP)*,
  CMS.gov (June 5, 2023), https://www.cms.gov/medicare/
  coordination-of-benefits-and-recovery/mandatory-insurer-
  reporting-for-non-group-health-plans/overview .................................. 9

*Medicare Beneficiaries as a
  Percent of Total Population*, KFF.org (2023),
  https://www.kff.org/medicare/state-indicator/medicare-
  beneficiaries-as-of-total-pop/?currentTimeframe=2&sort
  Model=%7B%22colId%22:%22Location%22,%22sort%22:%
  22asc%22%7D ................................................................ 12

Medicare Managed Care Manual (2014) .................................... 9

Medicare Prescription Drug Manual (2011) ............................. 10

Memorandum from CMS,
  Transition to Part D Coverage of Benzodiazepines and
  Barbiturates Beginning in 2013 (Oct. 2, 2012) .................................... 16

## INTEREST OF *AMICUS CURIAE*[1]

American Property Casualty Insurance Association ("APCIA") is the primary national trade association for home, auto, and business insurers. APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years. APCIA's member companies write nearly $593 billion in direct written premium and assumed reinsurance premium, representing 63 percent of the U.S. property-casualty insurance marketplace.

MARC, the Medicare Advocacy Recovery Coalition ("MARC") is a not-for-profit association that was formed in September 2008 to advocate for the improvement of the Medicare Secondary Payer ("MSP") program for beneficiaries and affected companies. Formed by a group of entities in the regulated community, MARC's membership comprises entities representing virtually every sector of the MSP-regulated community, including insurers, insurance and trade associations, self-insureds, and third-party administrators. MARC is deeply interested in improving the

---

[1] No party's counsel authored this brief. No party, party's counsel, or person other than *amicus curiae*, its members, or its counsel provided money for the brief's preparation or submission.

MSP program, and has worked with Congress, the Centers for Medicare and Medicaid Services, and the Courts to ensure the MSP program is functional and efficient for all stakeholders.

The DRI Center for Law and Public Policy is the public policy "think tank" and advocacy voice of DRI, Inc.—an international organization of approximately 16,000 attorneys who represent businesses in civil litigation. DRI's mission includes enhancing the skills, effectiveness, and professionalism of defense lawyers; promoting appreciation of the role of defense lawyers in the civil justice system; and anticipating and addressing substantive and procedural issues germane to defense lawyers and the fairness of the civil justice system. The Center participates as an *amicus curiae* in the U.S. Supreme Court, federal courts of appeals, and state appellate courts in an ongoing effort to promote fairness, consistency, and efficiency in the civil justice system.

# INTRODUCTION

Appellees have amply explained why the False Claims Act's "public disclosure" bar and the requirements of Federal Rules of Civil Procedure 8 and 9(b) require this Court to affirm the rulings of the district court. *Amici* offer this brief to make two points that further support affirmance. First, the Section 111 regulatory "reporting" process cannot, as a matter of law, suffice as a predicate for a reverse false claim under the False Claims Act—which, by definition, requires a failure to make a payment owed to the federal government. Second, and in particular, Relators' two exemplars ("E.A." and "K.S.") likewise could not support any False Claims Act claim (traditional or "reverse") in any event. To further explain these issues, we begin with a discussion of several key provisions of the MSP statute relevant to this case.

# STATUTORY BACKGROUND

## A.    The Medicare Program

Medicare Parts A and B are the fee-for-service provisions entitling eligible persons to have the federal government—through the Center for Medicare and Medicaid Services (CMS)—directly pay medical providers for services rendered. Medicare Part C governs the Medicare Advantage program, which empowers private insurers (called Medicare Advantage

Organizations or "MAOs") to contract with the government and provide Part A and B benefits to Medicare beneficiaries. Part D is a similar private-insurer-run program that provides the Medicare prescription drug benefit. As explained below, the False Claims Act requires "false claims" to the federal government under traditional Medicare Parts A and B, because only claims for payment made to the government, not claims made to private insurers, could be actionable through the MSP statute under the False Claims Act.

### B. The Medicare Secondary Payer Act

Congress enacted the MSP Act in 1980 to allocate liability between Medicare and private insurers known as "primary plans" in situations where more than one insurer is liable for an individual's medical costs. Before 1980, other than in workers' compensation cases, "Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained." *Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011). In other words, when Medicare and a private insurer (other than certain workers' compensation plans) were both liable for the same expenses, Medicare satisfied or partially satisfied the private

insurer's obligation. To curb Medicare's costs, Congress enacted the MSP Act to "invert[] that system" by making "private insurers covering the same treatment the 'primary' payers and Medicare the 'secondary' payer." *Id.*

The MSP Act, 42 U.S.C. § 1395y(b), as amended and updated over the years, made several changes to ensure that Medicare would be secondary to other available insurance. The current version of the statute has several critical elements:

- **Paragraph (2)** makes Medicare a secondary payer. Within that section, **paragraph (2)(A)** is a general ban prohibiting Medicare (or Medicare Advantage) plans from making payments for items or services for which a primary plan has paid or can reasonably be expected to pay. Congress prohibited any "[p]ayment under this subchapter" (meaning the entire Medicare program), if "payment ha[d] been made, or c[ould] reasonably be expected" to be made "promptly," *i.e.*, within 120 days. 42 U.S.C. § 1395y(b)(2)(A); 42 C.F.R. § 411.21 (defining "prompt" or "promptly" to be within 120 days). Thus, for example, if a Medicare beneficiary is involved

in a car accident and has auto insurance that covers the accident, the private auto insurer is the primary payer, and Medicare is prohibited from paying for any care related to the accident, unless the private auto insurer has not paid or cannot be reasonably expected to pay.

- **Paragraph (2)(B)** describes the circumstances and procedures under which the government can make a "conditional" payment, notwithstanding its status as a secondary payer, in cases where a payment from the primary payer has not been made or is not reasonably expected to be made "promptly." 42 U.S.C. § 1395y(b)(2)(B). In the auto accident example, if the private auto insurer denies coverage because the premium has not been paid or a coverage exclusion applies, Medicare may pay and, if the insurer later agrees to cover the claim (or is found responsible for the claim), Medicare may recoup its payments from either the Medicare beneficiary or the auto insurer.

- **Paragraph (6)** is a critical provision of the MSP Act rarely analyzed by this Court. Paragraph (6) puts Medicare (and

Medicare Advantage Organizations) on notice when a private insurer is potentially responsible for a claim. Recognizing that the beneficiary and the beneficiary's healthcare providers would be in the best position to collect relevant information, Congress provided: "Notwithstanding any other provision of this subchapter, no payment may be made for any item or service furnished under part B unless the entity furnishing such item or service completes (to the best of its knowledge and on the basis of information obtained from the individual to whom the item or service is furnished) the portion of the claim form relating to the availability of other health benefit plans." 42 U.S.C. § 1395y(b)(6)(A). In other words, services covered by Part B *cannot* be paid by the Medicare program unless the provider collects information from the beneficiary and fills out the claim form indicating whether other coverage exists. To return to the hypothetical, if information collected from a beneficiary by a healthcare provider indicates that the treatment was the result of an auto accident (which in virtually every case would mean that

auto insurance is available as a function of state law that requires drivers to maintain coverage), Medicare may not pay (unless and until the auto insurer declines coverage).

In fact, the form referenced in Paragraph 6, known as "Form 1500"1F[2] has a specific set of questions in box 10 to collect the information required by Paragraph (6). Box 10 asks "Is patient's condition related to": "employment" (Y/N), "auto accident" (Y/N), "other accident" (Y/N)? Under the law, Medicare is categorically prohibited from making payment unless box 10 is completed and the answer to each of these questions is "no." As a result of the Form 1500, Medicare should always be on notice if a primary insurer, like a no-fault auto insurer, is potentially responsible for covering a claim, and Medicare should never pay claims if it does not know.

- **Paragraph (8):** In 2007, Congress added another notice provision, known as "Section 111."2F[3] Paragraph (8) requires

---

[2] *Available at* https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf.

[3] The provision is known as Section 111 because it was contained in Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (MMSEA). Pub. L. No. 110-173, 121 Stat. 2492. Even the government

non-group health plans (consisting of auto, workers'
compensation, and liability insurers and self-insured entities)
to notify Medicare each time that they pay a settlement,
judgment, or award. Section 111 notice involves three steps.
First, the non-group health plan has to determine if the
claimant is a Medicare beneficiary, which is accomplished by
"querying" a Medicare database. Second, if the claimant is a
Medicare beneficiary, a more comprehensive report is
submitted to Medicare, so that Medicare can determine
whether it made any "conditional" payments. Third, if the
beneficiary is covered by an MAO under Part C or a
Prescription Drug Program under Part D, Medicare passes
the Section 111 information on to the MAO.3F[4]

---

calls the provision Section 111. *Mandatory Insurer Reporting (NGHP)*,
CMS.gov (June 5, 2023), https://www.cms.gov/medicare/coordination-of-
benefits-and-recovery/mandatory-insurer-reporting-for-non-group-
health-plans/overview. Technically Section 111 encompasses section (7)
applicable to group health plans and (8) applicable to non-group health
plans. This brief will only address the paragraph (8) notice provisions
because group health plans are not involved in this case.

[4] *See* Medicare Managed Care Manual, ch. 8, § 70.4.1 (2014), *available
at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/
downloads/mc86c08.pdf (regarding Medicare Advantage, "CMS sends
plans monthly reports that include all of the beneficiaries where

In no-fault auto coverage cases, such as the claims involved in this case, the government very rarely makes a conditional payment. That is because Medicare is prohibited by law from paying claims if the Medicare Form 1500 is not completed or indicates that treatment was required as a result of an auto accident. 42 U.S.C. § 1395y(b)(6)(A); *see also* 42 C.F.R. § 411.51(b) ("Except as specified in § 411.53, Medicare does not pay until the beneficiary has exhausted his or her remedies under no-fault insurance").4F[5] In other words, based upon the statutory design, which starts with the Medicare beneficiary and their doctor, the types of first-party auto coverage claims asserted in this case (and the overwhelming majority of auto cases) exceedingly rarely involve a government payment — making a False Claims Act case like Relators' inherently implausible.

---

Medicare is the Secondary Payer"); Medicare Prescription Drug Manual, ch. 14, § 30.1 (2011), *available at* https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/revised%20cob%20chapter%2014%20draft_14.pdf (Medicare Prescription Drug Part D).

[5] The exceptions enumerated in section 411.53 allow for Medicare to make a conditional payment only if: "(1) The beneficiary has filed a proper claim for no-fault insurance benefits but the intermediary or carrier determines that the no-fault insurer will not pay promptly for any reason other than the circumstances described in § 411.32(a)(1). This includes cases in which the no-fault insurance carrier has denied the claim; [or] (2) The beneficiary, because of physical or mental incapacity, failed to meet a claim-filing requirement stipulated in the policy."

# ARGUMENT

As the district court recognized, and as the Insurer Defendants' brief amply explains, Relators' False Claims Act case fails because the allegations were previously disclosed in the *Hayes* and *Takemoto* cases. Independently, however, the claims also fail because the alleged violations of Section 111 reporting requirements cannot constitute the basis of a False Claims Act violation, either in general or under the specific exemplars provided in this case.

## I. Section 111 Reporting Cannot Give Rise to Liability Under the False Claims Act.

The fact that an insurer has (or has not) reported a claim under Section 111 does not mean that the insurer is liable for a payment under the MSP Act. *See MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 86 (2d Cir. 2023) ("[W]e conclude that the text of Section 111 is not ambiguous and that a report filed under its provisions does not amount to an admission of liability."); *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-CV-2102, 2021 WL 1164091, at *6 (S.D.N.Y. Mar. 26, 2021) (rejecting as "factually inaccurate" the "underlying premise" of MSP Act complaint that "if a claim is reported to CMS, then any medical expense that may be associated with the claim is

reimbursable"). Reporting, or not reporting, simply does not establish whether an auto accident has resulted in a "conditional payment" for which the federal government may seek reimbursement.

In fact, it is exceptionally rare that reporting of first party auto insurance coverage will ever result in a "conditional payment" reimbursable to the government. The math is as follows: First, only an estimated 15-20% of all claims paid by auto insurers will even be paid to Medicare beneficiaries.5F[6] Of the remaining 15-20%, although no published figures exist, it is estimated that approximately 3-6% of the beneficiary claims will ever involve a "conditional payment" for medical expenses covered by auto no-fault coverage. This is not surprising, given that the vast majority of claims arising from auto injuries are tendered to auto insurers without ever being presented to Medicare. On the rare occasion when such a claim is presented to Medicare, the provider must

---

[6] Medicare beneficiaries constituted 18% of the population in 2019 when the second amended complaint was filed and are 19% of the population today. *Medicare Beneficiaries as a Percent of Total Population*, KFF.org (2023), https://www.kff.org/medicare/state-indicator/medicare-beneficiaries-as-of-total-pop/?currentTimeframe=2&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D. Auto insurers typically insure a younger cohort of policyholders than the general population, although the percentage of beneficiary policyholders varies by insurer based upon the policyholder demographic.

check Box 10 of the CMS Form-1500 indicating that the treatment arose from an auto accident (*see* 42 U.S.C. § 1395y(b)(6)), which requires Medicare to deny payment and refer the claim to the auto insurer. *See* 42 U.S.C. § 1395y(b)(2)(B)(i). Thus, only an estimated one percent (3-7% of the 15-20%) of auto insurance no fault claims will ever involve a conditional payment.6F[7]

As a result, it is not enough for a False Claims Act complaint assert that there was a regulatory requirement under Section 111 to report a claim to the government. Insurer reporting is not a condition of government payment, in the overwhelming number of cases no government payment likely was ever made, and reporting has nothing to do with whether the government did or did not make a conditional payment. *U.S. ex rel. Hobbs v. MedQuest Assocs.,* 711 F.3d 707, 713 (6th Cir. 2013) ("because these regulations are not conditions of payment, they do not mandate the extraordinary remedies of the False Claims Act and

---

[7] Medicare seeks recovery for conditional payments at a higher rate than 3-7%, but insurers dispute approximately 90% of Medicare's demands through the administrative appeals process due to government claims for care unrelated to the auto accident, and the insurers typically prevail in approximately 85% of those appeals. Thus, after the appeals process, in only 3-7% of the beneficiary cases is an actual "conditional payment" present and subject to reimbursement by the insurer.

are instead addressable by the administrative sanctions available"). Alleged lapses in Section 111 reporting are simply not enough by themselves to plead a False Claims Act case.7F[8]

Ultimately, this case and its references to Section 111 compliance come full circle right back to the Second Circuit decision in *United States ex rel. Takemoto v. Nationwide Mutual Insurance Co.,* 674 F. App'x 92 (2d Cir. 2017) (mem.)—one of the cases that publicly disclosed the asserted claims in the first instance. The Second Circuit held: "Takemoto's 'allegations supply nothing but low-octane fuel for speculation' about the requisite reimbursement obligation element of his claims, which cannot defeat Rule 12(b)(6) dismissal even under the basic pleading requirements of Rule 8(a)." 674 F. App'x at 95 (quotation marks and citations omitted). The very same is true here. Relators' allegations about reporting lapses under Section 111 and supposed failures to reimburse private insurers are the same low-octane fuel for speculation

---

[8] In an effort to overcome this glaring flaw, the complaint, without any support, tries to hint at an "implied false certification" by alleging some sort of "certification" that insurers must make when submitting Section 111 reports. Second Amended Complaint, ECF 41, PageID.1073-74 ¶¶ 240, 244. But no such certification requirement actually exists.

that cannot state a False Claims Act claim based on the theory that insurers failed to repay the federal government.

## II. The Allegations Regarding Exemplars E.A. and K.S. Fail to State a Claim.

Even if noncompliance with Section 111 theoretically could be used to make out some False Claims Act case (and *Amici* do not think it can), the two exemplars alleged by Appellants in this case, E.A. and K.S., cannot. As to E.A., the second amended complaint alleges that "E.A. was dispensed hydrocodone-acetaminophen and/or alprazolam on at least forty-two times. Of those, Medicare Part B provided payment for twenty-nine of the accident-related medical expenses." *See* ECF No. 41, PageID.1071 ¶ 231. But as a matter of law, that cannot be true. Hydrocodone-acetaminophen is the generic name for Vicodin, and alprazolam is the generic name for Xanax, both of which are self-administered drugs purchased from a pharmacy and thus covered by private-insurer-run *Part D* Prescription Drug Plans, and not the government-paid Part B program. 42 U.S.C. § 1395x(s)(2)(A) (defining covered Part B drugs to only include "drugs and biologicals which are not usually self-administered by the patient"). Indeed, the second amended complaint alleges the drugs were dispensed through "pharmacies," ECF

No. 41 PageID.1071 ¶ 232, making them private-insurer Part D and not

government Part B drugs.8F[9]  Similarly, exemplar K.S.—which Relators

suggest is an example of the "reporting failures" supposedly detected by

their computer systems (*see* ECF No. 41 & App. B, PageID.1069 ¶ 215,

1089-90)—involves a conditional payment by a private insurer Medicare

Advantage Organization that cannot possibly be the basis of any claim

under the False Claims Act.

In an unpublished decision, this Court has previously found that

Medicare Advantage Organizations, at least for claims payment and

reconciliation purposes, are private insurers and not government agents.

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.,* 647 Fed.

---

[9] Vicodin is an opiate pill, which has always been covered in the Part
D program since its inception.  Xanax is a benzodiazepine pill, which has
been in the Part D program since 2013.  *See* Memorandum from CMS,
Transition to Part D Coverage of Benzodiazepines and Barbiturates
Beginning in 2013 (Oct. 2, 2012), *available at* https://www.cms.gov/
Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/
Downloads/BenzoandBarbituratesin2013.pdf.  It is both concerning and
suspicious that E.A. is alleged to have been receiving 42 prescriptions of
opioids and benzodiazepines from multiple prescribers and pharmacies—
a situation that has been called out by the HHS Office of Inspector
General as a sign that the "beneficiary is seeking medically unnecessary
drugs—perhaps to use them recreationally or to divert them."  HHS OIG,
No. OEI-02-22-00390, Opioid Overdoses and the Limited Treatment of
Opioid Use Disorder Continue to Be Concerns for Medicare Beneficiaries,
at 4 (Sept. 2022).

App'x 619, 625 (6th Cir. 2016) (rejecting removal on the grounds that Medicare Advantage Organizations were "private insurers" not acting on behalf of the federal government for payment purposes, thus rendering the case a "private billing dispute" to be resolved in state court). The same holding should apply to Part D Plans, which are similar private insurers. As such, failure to repay Medicare Advantage or Part D claims under the Medicare Secondary Payer statute cannot be the basis of a False Claims Act case. For these reasons, too, the district court's decisions should be affirmed.

## CONCLUSION

Alleged Section 111 violations standing alone should not be the predicate of a False Claims Act case. The overwhelming majority of claims reported never connect to a government payment because the design of the MSP program ensures that physicians identify auto accident care at the time a claim is submitted so that Medicare virtually never pays the claim in the first instance. And to the extent that a non-reported claim involves conditional payments by a private-insurer Medicare Advantage Organization or Part D Plan, such allegations cannot state a False Claims Act claim at all. By definition, a failure

under the Medicare Secondary Payer Act to reimburse a private Medicare Advantage Organization or Part D Plan is not a failure to repay the federal government.

For these reasons and those set forth by Appellees, the Court should affirm the district court's rulings.

Respectfully submitted,

*/s/David J. Farber*

| | |
|---|---|
| Timothy H. Lee | David J. Farber |
| KING & SPALDING LLP | *Counsel of Record* |
| 1180 Peachtree Street NE | KING & SPALDING LLP |
| Suite 1600 | 1700 Pennsylvania Avenue NW |
| Atlanta, GA 30309 | Washington, DC 20006 |
| (404) 572-4600 | (202) 737-0500 |
| tlee@kslaw.com | dfarber@kslaw.com |

*Counsel for Amici Curiae*

August 23, 2023

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5). This brief contains 3,412 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 MSO in 14-point Century Schoolbook font.

Date: August 23, 2023

*/s/ David J. Farber*
David J. Farber

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David J. Farber*
David J. Farber